OPINION OF THE COURT
Bernard Fuchs, J.
This action was tried to a jury which rendered its verdict on October 16,1992. Douglas Levy, Esq. was counsel for plaintiffs.
From the inception of the trial and even during pretrial settlement conferences, Mr. Levy directed a steady stream of sarcastic, belligerent, defiant and overbearing words and actions at the court and sometimes at opposing counsel. These abuses accumulated steadily despite the court’s repeated efforts to subdue them and despite a warning it addressed to Mr. Levy at one point that he was moving toward a citation for contempt of court.
After the jury was discharged on October 16,1992, the court directed Mr. Levy to appear before it at 11:00 a.m. on October 21, 1992 for a hearing to determine whether sanctions should be imposed upon him, and if so, what the sanctions should be. (22 NYCRR 130-1.1.) The hearing was adjourned to October 23, 1992 at the request of Mr. Levy’s counsel because Mr. Levy did not appear on October 21, 1992.
After the hearing, the court concluded that Mr. Levy’s course of conduct had been undertaken primarily to harass or maliciously injure the court and opposing counsel. Indeed, it seemed that his actions were aimed at intimidating court and counsel. The court informed Mr. Levy that the sanction imposed would be a payment of $1,800.
The form of the hearing is not specified in the applicable rules. The court, however, undertook to describe at the hearing those objectionable actions which the court was then able to recall or derive from a scan of the record made by the court reporter. No transcript of the proceedings was available and no one had sought to memorialize Mr. Levy’s misbehaviors. The specifications which the court stated were therefore incomplete. When the court had concluded, he was invited to be heard. No limit was placed on the length or scope of Mr. Levy’s presentation.
*966 The items expressly stated for Mr. Levy at the hearing were the following:
1. On October 9, 1992, before the jury, Mr. Levy offered photographs in evidence. When they were admitted, the court directed, at his request, that the photographs be given to the jury for examination. The court also instructed Mr. Levy to continue examining the witness while the jury viewed the photographs. Mr. Levy not only objected but repeatedly insisted that the court let him stop during the view. When that tactic failed, he ridiculed the opening remarks the court had addressed to the jury before the trial and argued that if the court could waste time with those remarks he should have two minutes for the view. Finally, when Maureen Sullivan, Esq., defendant’s counsel rose to cross-examine the witness, Mr. Levy demanded that the jury examine his photographs during her cross-examination.
2. On the same day, before the jury, the court addressed its first question in the case to a witness. Mr. Levy objected to the question, not on its merits but because it came from the court and asserted, "You’re not a lawyer.” He objected to every question the court might ask and returned to that subject repeatedly later on. When the court gave Mr. Levy a standing objection to everything the court said or did during the trial (hoping to move ahead) Mr. Levy still did not subside.
3. During a conference in the robing room the same day (on the record) Mr. Levy insisted that he faced a very hostile court. He then denied he had said it and then said it again. And this was followed by extended, obstreperous argument on the court’s alleged bias against him. Mr. Levy raised his voice and yelled at the court — a fact which Ms. Sullivan noted for the record.
4. On October 14, 1992, in the robing room, the parties argued their conflicting views as to the effect of an 8A order. Mr. Levy addressed Ms. Sullivan in such a hostile, patronizing and impatient tone that the court felt compelled to correct him. When the court ruled for defendant after argument, Mr. Levy’s sarcastic observation was "What a surprise, another ruling in favor of the Transit Authority. If I got one accurate, good, proper ruling during this trial I would come in with Richardson.”
Mr. Levy then followed up with other choice remarks— including a complaint that the Judge "listens to her [Ms. Sullivan] and she doesn’t know what you are talking about *967 and you just adopt what she says.” Another observation was that "Professor Farrell should be here to witness what is going on” (i.e., to see how stupid the Judge is).
5. The same day before the jury, defendant offered a document in evidence. The court asked Mr. Levy not once, but twice, whether he had an objection. When there was no answer, the document was admitted. Then Mr. Levy objected. When the court reminded him of his silence, his excuse was that the court would have admitted the document anyway. That did not keep Mr. Levy from objecting again.
When the court pointed out to Mr. Levy that his objection was late, he answered, "I had a feeling the objection would go against me.” Ms. Sullivan then apparently felt compelled to object to Mr. Levy’s sarcasm (and obvious hostility).
6. Later that day, in the robing room during argument, Mr. Levy stated an objection so vehemently that the court cautioned him not to "panic.” A dialogue followed during which Mr. Levy sarcastically insisted that his panic was justified by the court. He then remarked that Judge Fuchs is "not going to come around till the friggin’ trial is over.”
7. On October 15, 1992 before the jury, the court addressed several questions to a witness. The questions and answers were apparently not loud enough for Mr. Levy to hear. His response was to address the court: "I’m glad you two are having a private conversation. Could we get some testimony for the jury?” The court rebuked Mr. Levy for addressing it with such patent sarcasm and not simply informing the court that he could not hear. The court then had the questions and answers read back by the reporter. And Mr. Levy, still not content, asserted, "I would like to ask my questions.”
8. The same day, long after an earlier exchange concerning an ambulance record had been laid to rest, Mr. Levy again complained (before the jury) that the court had not received it in evidence.
9. On October 16, 1992 in the robing room, Mr. Levy, perceiving that the argument on an issue of evidence was going against him addressed the court’s law assistant (or court attorney) Alexander Berger, Esq., "Alex, I need your help with the judge.” The court directed Mr. Levy not to address members of the court’s staff and to confine himself to argument. Within another minute or two Mr. Levy turned to Mr. Berger and said, "Would you please convince him.” When the court reminded him that he had been asked to refrain from that, *968 Mr. Levy responded by loudly upbraiding the court and demanding, "Why did I bring witnesses, why did I bring her?”
10. The same day, during a robing room conference, the court informed counsel of rulings concerning proposed jury instructions. At the same time it displayed to counsel for comment a card bearing its intended charge as to the parties’ contentions at the trial. One of plaintiffs contentions, stated on the card, was that the accident had occurred at about 11:30 a.m. as Mr. Candolfi had testified. Mr. Levy objected to that statement, contending that the time should be 11:11 a.m. as it appeared on an emergency medical service record which was not in evidence. Mr. Levy insisted that attributing the 11:30 a.m. hour to plaintiff would convert his summation into "a complete lie because I know what is in the ambulance report.”
11. During the course of that argument Mr. Levy turned to Ms. Sullivan (off the record) and said, "You are the stupidest woman I’ve ever seen.”
12. Counsel summed up the same day. During Mr. Levy’s summation he accused the Transit Authority of a "cover-up” and of not presenting its "real” bus maintenance records in court. He asserted that defendant Kennedy (the bus driver, who insisted that he had not even been in an accident) could have lost his job if he had acknowledged leaving the scene of the accident (as Mr. Levy claimed he had done). Mr. Levy also claimed that the Transit Authority had done all it could to "keep the real truth away from the jury.” The court vigorously corrected Mr. Levy for these assertions, none of which had the remotest basis in the evidence.
13. After the jury delivered its verdict the court invited counsel to address the jury before it was discharged. In other cases, this is an occasion for all sides to thank the jury for its service. Mr. Levy’s response was "I’ve always been told, when you have nothing nice to say, don’t say anything.”
14. When the time came for postverdict motions, Mr. Levy’s observation was that "the verdict is not worth the paper it is printed on because of your behavior during this trial.” He then added "I intend on making an appeal and intend on making more than an appeal when the time is right.” This statement was clearly intended to menace the court when postverdict motions were still being heard. Could Mr. Levy have intended to influence the decision on those motions?
15. After the case was concluded the court directed Mr. Levy to appear before it on the following Wednesday at 11:00 *969 a.m. to be heard on the question whether it should impose sanctions on him, and if so, what the sanctions should be. Mr. Levy’s response was "I can state that it is very unlikely that I will attend.”
16. Another fact, which the court did not specify for Mr. Levy at the hearing, is that during the trial (but not on the record) he ridiculed the court for having served almost 16 years on the Civil Court Bench without being advanced to a higher court. The inescapable implication (which was not lost on other persons in the courtroom) was that this was due to the court’s incompetency or general inadequacy.
The foregoing account of Mr. Levy’s conduct requires no refinements of analysis. The conclusion is inescapable that such actions by counsel have no place in an American trial. The search for truth based on evidence simply cannot proceed when the court’s authority is challenged and defied at every turn, abuse is heaped on the court and opposing counsel, adverse rulings are never accepted (even with objections preserved) and the court’s dignity and decorum are continually undercut.
Such behavior can have no purpose except to harass and maliciously injure the court and opposing counsel. They aim at nothing less than a victory of unbridled egotism and arrogance over the judicial process and the rule of law.
It should not pass without notice, moreover, that Mr. Levy’s actions violated several provisions of the lawyers’ Code of Professional Responsibility. Code of Professional Responsibility DR 7-106 (A) (22 NYCRR 1200.37) prohibits him to "disregard a standing rule * * * or a ruling of a tribunal made in the course of a proceeding.” Subdivision (C) (1) forbids him to "[s]tate or allude to any matter [e.g., a cover-up] * * * that will not be supported by admissible evidence.” Subdivision (C) (6) condemns "undignified or discourteous conduct which is degrading to a tribunal.” And DR 7-102 (A) (1) (22 NYCRR 1200.33) has been offended by Mr. Levy’s "action on behalf of the client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another,” such as his personal attacks on the court and Ms. Sullivan.
EC 7-37 has found no response in Mr. Levy’s professional performance. It provides that a "lawyer should not make unfair or derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the *970 orderly administration of justice and have no proper place in our legal system.” Equally dishonored by Mr. Levy is EC 7-36: "[the lawyer] should not engage in any conduct that offends the dignity and decorum of proceedings * * * a lawyer should be respectful, courteous, and above-board in his relations with a judge.”
It is sad for Mr. Levy that the court would have withdrawn its threat of sanctions if he had acknowledged his fault or at least the most flagrant offenses, offered an apology and stated a resolve to do better in future trials. But far from apologizing, he persisted in his defiance and contumacy to the very end.
When Mr. Levy eventually decided to appear for his hearing on October 23, 1992, his response to the virtual bill of particulars the court had recited for him consisted entirely of denial, justification and self-righteous defiance. "I did not say she was the stupidest woman I ever seen, but I did use the word stupid in reference to Miss Sullivan and I do not apologize for using that word in the context that I did.” As to the court asking a question of a witness: "I felt that was not the judge’s function in the manner in which he said so, and I objected to it.”
And a large part of Mr. Levy’s response at the hearing was a renewed attack on the court. It would be easy to conclude from his remarks that the hearing was really a trial of the court for its myriad forms of misconduct.
In the circumstances, the court is left no alternative to the imposition of sanctions. 22 NYCRR 130-1.2 requires the court to state "the reasons why the court found the amount * * * imposed to be appropriate.” Unfortunately there is no mathematical formula with which to compute the amount. All that a court can do in such a case is to estimate what amount will sting sufficiently to communicate its demand for improved professional conduct without imposing excessive hardship. The court had considered a sanction of $2,500 or $3,000 because the abuses have accumulated without interruption and Mr. Levy remains defiant. After reflecting, however, that Mr. Levy is a relatively young lawyer who may not yet have attained great financial success, the amount was set at $1,800.
The clerk will enter judgment requiring Douglas Levy, Esq. to deposit $1,800 with the Clients’ Security Fund established pursuant to section 97-t of the State Finance Law.